***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. Accordingly, the Full Commission affirms, with some modifications, the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On all relevant dates, the parties were subject to the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. On all relevant dates, an employment relationship existed between plaintiff-employee and defendant-employer.
3. Thorn Apple Valley was purchased by IBP Foods (now Tyson) subsequent to plaintiff's contraction of her alleged occupational diseases. At the time plaintiff contracted her alleged occupational disease, IBP Foods/Tyson Foods was not on the risk for Thorn Apple Valley's workers' compensation claims.
4. On all relevant dates, plaintiff's average weekly wage was $366.25.
5. At and subsequent to the hearing before the Deputy Commissioner, the parties submitted a Packet of Medical Records, which were admitted into the record, and marked as Stipulated Exhibit (2) and a Packet of Industrial Commission Forms, which were also admitted into the record, and marked as Stipulated Exhibit (3).
6. The issues to be determined are as follows:
 a. Whether plaintiff contracted a compensable occupational disease on or about April 5, 1999 and if so, to what indemnity and medical compensation, if any, is she entitled; and
 b. Whether Tyson Foods/IBP Foods was the employer on the risk at the time of plaintiff's last injurious exposure.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the Deputy Commissioner, plaintiff was fifty-two years of age. She attended high school through the eleventh grade and subsequently enrolled at Coastal Carolina Community College and as she testified, obtained her high school diploma. *Page 3 
Prior to her employment with Thorn Apple Valley, plaintiff worked at a fast food restaurant. Plaintiff testified that she started working for Thorn Apple Valley in 1980.
2. In 1980, plaintiff began working in the "ends and pieces" area for Thorn Apple Valley. In that capacity, plaintiff's work involved putting ends and pieces into a box and then transferring approximately fifteen boxes at a time to a table. Plaintiff worked in this position for five years. Plaintiff then began working as a "scaler." In this position, plaintiff took meat from a conveyor with her left hand and placed it on a scale and then placed the meat off to her right side using her right hand. The weighed meat would then move down the line to the vacuum where it was sealed prior to boxing for delivery.
3. Sometime in January or February 1999, plaintiff began working as a vacuum operator sealing the packages of meat. Defendant contends that the period during which plaintiff worked in this capacity lasted only for a few days, or perhaps somewhat longer. Plaintiff asserts that she worked in this capacity for approximately four months. Plaintiff testified that the equipment associated with this position was tall and that it was not unusual for packages to get stuck in the machine, thereby requiring her to reach for and remove the packages that were stuck. While admitting that on some days, no packages became stuck, plaintiff testified that on other days, packages became stuck twenty to thirty times. Plaintiff estimated it took her approximately forty-five minutes to fill a pallet with boxes containing twelve to twenty-four packages of bacon and that it took seventy-two boxes to fill a pallet.
4. On June 22, 1999, defendant purchased certain assets of Thorn Apple Valley and plaintiff then became an employee of defendant. Defendant did not assume Thorn Apple Valley's liabilities. Additionally, the contract of sale provided that Thorn Apple Valley would remain liable for workers' compensation claims occurring before the date of the sale. *Page 4 
5. When defendant acquired the plant in 1999, it instituted a policy requiring workers to rotate positions. Subsequent to this change, plaintiff testified that she would switch between the "scaler" position and a "flat table" position. In the "flat table" position, plaintiff fed what was described as "over leakers" into the track with her left hand, while using her right hand to remove meat from a table. Additionally, plaintiff stated that she would push the meat down the line continuously while working in this capacity.
6. When plaintiff worked as a vacuum operator, she began experiencing pain in the middle of her back and between her shoulder blades. Plaintiff contends that she notified defendant of her condition but that she was not instructed to seek medical treatment.
7. Plaintiff first sought treatment on her own with Onslow Doctors Care where she was prescribed muscle relaxants and released to return to work. Due to ongoing back and shoulder symptoms, plaintiff sought additional treatment from Dr. James Markworth. Following an examination, nerve conduction studies and a cervical MRI, Dr. Markworth continued plaintiff on muscle relaxants and opined that her condition was work-related, although no evidence of an acute cervical condition or herniated disc was revealed. Dr. Markworth also assigned plaintiff work restrictions of no heavy lifting, grasping or repetitive use of the left hand. Dr. Markworth notified Mr. Kenneth Shaw, an employee of Thorn Apple Valley of these restrictions. Plaintiff contends that upon receiving her assigned work restrictions, she was informed by Thorn Apple Valley that no suitable work was available.
8. Subsequent to April 19, 1999, plaintiff did not return to work in any capacity until June 1999. At that time, plaintiff returned to work for defendant rotating between the "scaler" and "flat table" positions. As she was required to do prior to the commencement of her medical treatment, plaintiff used both arms in the course of her duties in these positions. *Page 5 
9. Plaintiff contends that her symptoms never entirely subsided and that she continually informed her supervisors that she was experiencing pain, but that no alternative employment was provided. For her ongoing symptoms, plaintiff periodically sought additional treatment with Dr. Markworth, as her finances allowed. In November 1999, Dr. Markworth diagnosed plaintiff as having impingement syndrome in both shoulders and calcific tendinitis in her rotator cuff. Dr. Markworth has opined that these calcium deposits are caused by a combination of overuse and degeneration as opposed to a single acute trauma.
10. On May 24, 1999, plaintiff began a course of physical therapy. An evaluation note dated May 25, 1999 from Ms. Kathy Fagan, a physical therapist with Rehab Management Systems, Inc. indicates that plaintiff was able to lift twenty pounds and could perform overhead activities for five minutes without significant difficulty. As of June 18, 1999, therapy progress notes reflect that plaintiff had met her short-term goals and some of her long-term goals.
11. Following her return to work for defendant in June 1999, plaintiff mainly worked the "scaler" and "flat table" positions. Occasionally however, plaintiff was rotated to what was referred to as the "Jane Lewis" area, where she would weigh meat and move trays weighing between thirty and forty pounds. Plaintiff testified that she would remain in this position for a day or two before returning to her more regular positions.
12. On September 27, 1999, Dr. Markworth recommended that plaintiff continue working with her sole restriction of working no more than six days per week. On November 8, 1999, Dr. Markworth noted that plaintiff's condition had improved by working fewer days and informed her that she could return as needed.
13. On May 17, 2000, plaintiff presented to Dr. Jeffrey L. Gross, an orthopedic specialist. Dr. Gross reviewed x-rays and noted that plaintiff had mild disc space narrowing and *Page 6 
spurring at the C4-C5 level. Dr. Gross also noted that plaintiff had degenerative disc disease of the cervical spine and bursitis in her left shoulder. For these conditions, Dr. Gross prescribed medications and recommended an exercise program. Plaintiff returned to Dr. Gross in May 2001 and she was diagnosed as having deQuervian's synovitis and left shoulder bursitis. At that time, Dr. Gross did not think that plaintiff's conditions warranted surgery or additional diagnostic tests.
14. Plaintiff continued seeking medical treatment and presented to Dr. Michael Apostolou, a neurologist, who ordered an MRI of the brain and cervical region. The MRIs were performed on September 18, 2001 and did not reveal evidence of a herniated disc.
15. Plaintiff continued to work for defendant until the plant closed in May 2002. Thereafter, plaintiff applied for and received unemployment benefits for approximately nine months in the amount of $220.00 per week.
16. Along with seeking treatment for non-work related conditions, on July 29, 2002 plaintiff reported cervical pain along with low back pain to her family physician, Dr. Richard Jordan.
17. Subsequent to the plant's closing, plaintiff met with representatives from Vocational Rehabilitation, who began assisting her with payments for her ongoing medical treatment. Plaintiff continued to experience problems with her neck and shoulders and Vocational Rehabilitation referred her to Dr. C. E. Ballenger, a neurologist. Dr. Ballenger first examined plaintiff on December 16, 2002, and diagnosed her as possibly having bilateral carpal tunnel syndrome. Dr. Ballenger later referred plaintiff to Dr. Sean Hsu, a neurologist.
18. Dr. Hsu first examined plaintiff on June 17, 2003 and diagnosed her as having a herniated disc at the C3-C4 level. For this condition, Dr. Hsu performed a cervical discectomy *Page 7 
on July 3, 2003. Dr. Hsu last examined plaintiff in February 2004, at which time he noted that she was doing well and released her from his care with no specific restrictions.
19. Dr. Markworth opined to a reasonable degree of medical certainty that plaintiff's employment with defendant, specifically her work as a vacuum machine operator, caused or significantly contributed the deterioration of her left shoulder and the conditions for which she sought treatment in March 1999. Dr. Markworth did not opine as to whether plaintiff's employment with defendant exposed her to an increased risk of the development of these conditions as opposed to members of the general public not so employed.
20. After reviewing a job description, Dr. Hsu initially opined to a reasonable degree of medical certainty that plaintiff's employment with defendant was the cause of her herniated disc. Dr. Hsu further testified that plaintiff's employment with defendant exposed her to an increased risk of developing a cervical herniated disc as opposed to members of the general public not so exposed. However, Dr. Hsu rendered these opinions without knowledge that the MRIs taken on April 9, 1999 and September 18, 2001 revealed no cervical disc herniation according to the accompanying reports. Upon learning of these prior MRI results, Dr. Hsu opined that plaintiff's herniated disc occurred subsequent to September 18, 2001. More importantly, Dr. Hsu concluded that he was unable to determine when during the period of September 18, 2001 to June 17, 2003 plaintiff's herniated disc occurred.
21. Plaintiff attempted to return to work as a housekeeper in November 2005 but was only able to work for a month due to her ongoing pain. Plaintiff testified that she has sought employment on a daily basis by consulting the newspaper and vocational rehabilitation services.
22. Although there is some medical evidence that plaintiff's employment with defendant caused or significantly contributed to her bilateral shoulder tendonitis, there is no *Page 8 
credible medical evidence of record that plaintiff's employment exposed her to an increased risk of the development of this condition as opposed to members of the general public not so employed.
23. There is insufficient medical evidence of record upon which to find that plaintiff's employment with defendant caused or significantly contributed to her herniated disc or exposed her to an increased risk of the development of this condition.
24. There is insufficient evidence of record upon which to find that any disability plaintiff had subsequent to the closing of the plant in May 2002 was the result of her employment with defendant.
25. There is insufficient credible evidence of record upon which to find that plaintiff filed her claim more than two years after being notified by a competent medical professional of its potential work relatedness.
26. On all relevant dates, plaintiff's average weekly wage was $366.25, yielding a compensation rate of $244.29.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. An occupational disease is defined as any disease "which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of employment." N.C. Gen. Stat. § 97-53(13). *Page 10 
2. Plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13). This requires plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44, 283 S.E.2d 101(1981). In the instant case, plaintiff has failed to show that she was at an increased risk of developing a cervical herniated disc or bilateral shoulder tendonitis due to her employment with defendant-employer. Therefore, plaintiff does not have an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13).
3. Because plaintiff's bilateral shoulder tendonitis and cervical disc herniation are not compensable occupational diseases, she is not entitled to indemnity or medical compensation. N.C. Gen. Stat. §§97-2(6); 97-2(9).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim for benefits must be, and is hereby denied.
2. Each side shall pay their own costs.
This the __ day of July 2007.
S/___________________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1